UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | |
|---|---|
| ADRIENNE HENRY, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Case No. 1:24-cv-00218-MTS |
| ) | |
| IRON COUNTY, *et al.*, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Defendant Jeffrey Burkett's Motion to Dismiss, Doc. [68]; Defendant Donald Rickie Gaston's Motion to Dismiss, Doc. [45]; Defendant Iron County's Motion to Dismiss Counts I and II, Doc. [36]; Verizon Communications Inc. ("Verizon")'s Motion to Dismiss or Compel Arbitration, Doc. [44]; Defendant Matthew Cozad's Motion to Stay Proceedings, Doc. [66]; and Defendant Gaston's Motion to Stay Proceedings, Doc. [79]. Each Motion is fully briefed and ripe for decision. For the reasons that follow, the Court will grant Iron County's Motion to Dismiss and Verizon's Motion to Compel Arbitration, but the Court will deny all others at this time.

**I.    Background**[1]

For several years, Plaintiff Adrienne Henry and Defendant Gaston were in a long-term relationship characterized by "periods of separation and reconciliation." Doc. [1] ¶¶ 12, 15. They share custody of their daughter, J.G., pursuant to the terms of a temporary custody order that gives Plaintiff Henry custody "at all times that Defendant Gaston [is] not expressly entitled to custody." *Id.* ¶¶ 13–14. Against this backdrop, on February 08, 2023, Plaintiff Henry and Defendant Gaston

---

[1] The facts are taken from the allegations in Plaintiffs' Complaint.

became embroiled in a heated argument that eventually required police intervention. *Id.* ¶¶ 16–19. Three law enforcement officers arrived at Defendant Gaston's residence, including Defendant Chase Bresnahan, Iron County Sheriff's Deputy. After police separated the parties, Defendant Gaston allowed Plaintiff Henry to leave the home with her daughters, Plaintiff R.H. and J.G., without further issue. *Id.* ¶¶ 20–22. With police assistance, Plaintiff Henry returned to Defendant Gaston's residence the next day, but Defendant Gaston refused to let anyone inside. *Id.* ¶ 23.

By February 10, 2023, Plaintiff Henry, Plaintiff R.H., and J.G. had gone to stay at a relative's home in Jefferson County so that they could safely distance themselves from Defendant Gaston. In the meantime, Defendant Bresnahan filed a warrant application with the Iron County Prosecuting Attorney requesting felony charges against Plaintiff Henry for assault in the first degree and endangering the welfare of a child in the first degree, but the Prosecuting Attorney denied the issuance of any criminal charges. *Id.* ¶ 25. Plaintiff Henry also received a phone call from Defendant Matthew Cozad, another Iron County Sheriff's Deputy, who told her that "the Iron County Judge was at the Iron County Sheriff's Office waiting for her to bring J.G. to them." *Id.* ¶ 26. Plaintiff Henry's attorney called the judge to confirm but learned that Defendant Cozad's assertions were not true. *Id.* ¶ 27. When Plaintiff Henry's attorney called Defendant Cozad and confronted him with this information, Defendant Cozad continued to demand that J.G. be brought to him immediately. *Id.* ¶ 27.

That afternoon, Defendant Burkett, Iron County Sheriff, called the Washington County 911 Dispatch Center ("Dispatch Center") requesting a "ping" to locate Plaintiff Henry via her cell phone and "check [her] well-being." *Id.* ¶ 28. During the call, Defendant Burkett falsely told the operator that Plaintiff Henry was "possibly intoxicated" and that J.G. was "potentially injured." *Id.* ¶ 29. He also stated that he was with Defendant Gaston, who reportedly instructed Defendant

Burkett on what to say to the dispatch operator. *Id.* ¶¶ 31–32. At 6:34 p.m., Verizon provided the cell phone's location "without certification of immediate danger of death or injury to a person." *Id.* ¶ 30. At 9:22 p.m., Defendant Gaston called the Dispatch Center to reach Defendant Burkett, explaining to the operator that "[Burkett] and I are working together tonight." *Id.* ¶ 33. An hour later, Defendant Burkett contacted the Dispatch Center once more regarding Plaintiff Henry's "pinged" location and confirmed that it was the home of Plaintiff Henry's relative. Defendant Burkett proceeded to give the address to Defendant Gaston. *Id.* ¶ 35. Eventually, a Jefferson County Sergeant was dispatched to conduct a welfare check on the children at Plaintiff Henry's location. He found no visible injuries and reported to Defendant Burkett that "the children were fine" and that Plaintiff Henry would not be taken into custody.[2] *Id.* ¶ 36. The next day, Plaintiff Henry took J.G. to an urgent care center to document the fact that J.G. was uninjured. *Id.* ¶ 37.

Finally, on February 18, 2023, Defendant Bresnahan contacted the Dispatch Center to request yet another "ping" for a cell phone belonging to Plaintiff Henry. *Id.* ¶ 41. This time, the Dispatch Center rejected his request for lack of an active investigation. Undeterred, Defendant Bresnahan ascertained the phone's location directly from Verizon. *Id.* ¶ 43. That same day, while Plaintiff R.H. was staying with a friend, multiple Iron County Sheriff's Deputies arrived at the friend's residence and asked Plaintiff R.H. to come with them to give a report at the police station. *Id.* ¶ 39. As a result, Plaintiff R.H. was driven to the station under police escort. *Id.* ¶ 40. "On April 26, 2023, Defendants Burkett, Cozad, Bresnahan, and Gaston were arrested on charges of Participating Knowingly in Criminal Street Gang Activities, Tamper or Attempt to Tamper with a Victim in a Felony Prosecution, Stalking, and Misusing '911,' among others." *Id.* ¶ 45.

---

[2] In response to this report, Defendant Burkett allegedly told the officer, "[o]kay, that's fine . . . well, they're gonna have another issue because Gaston is on his way [to the relative's home]." Doc. [1] ¶ 36.

Based on the above, Plaintiff Henry and Plaintiff R.H. filed a ten-count Complaint against Defendants Burkett, Gaston, Bresnahan, Cozad, Iron County, and Verizon.  Plaintiffs assert five claims under 42 U.S.C. § 1983, including: Unreasonable Search (Count I); Unreasonable Seizure (Count II); Conspiracy (Count III); and Deliberately Indifferent Policies, Practices, Customs, Training, and Supervision (Counts IV and V).[3]  The remaining five claims, brought solely against Verizon, are as follows: Voluntary Disclosure of Customer Records to a Governmental Entity pursuant to 18 U.S.C. § 2702(a)(3) (Count VI); Invasion of Privacy (Count VII); Intrusion Upon Seclusion (Count VIII); Breach of Contract (Count IX); and Negligence (Count X).  Defendants Burkett, Gaston, and Iron County have each filed Motions to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6).  Verizon has filed a similar Motion and, in the alternative, also moves to compel arbitration.  Finally, Defendants Cozad and Gaston have filed Motions that ask the Court to stay this action pending the resolution of their underlying criminal charges.[4]

## II. Discussion

### A. The Motions to Dismiss

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Glick v. W. Power Sports, Inc.*, 944 F.3d 714, 717 (8th Cir. 2019).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "[T]he complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible."  *Braden v.*

---

[3] The Court construes Count V as one brought against Defendant Burkett in his individual capacity because a claim against him in his official capacity "is treated as a suit against the municipality he serves," *Dornheim v. Sholes*, 430 F.3d 919, 926 (8th Cir. 2005), and here, Plaintiffs bring an identical claim against Iron County (Count IV).

[4] Defendant Bresnahan has failed to answer or otherwise respond to Plaintiffs' Complaint.

- 4 -

*Wal-Mart Stores*, 588 F.3d 585, 594 (2009).  As it must, the Court accepts the Complaint's well-pleaded facts as true and draws all reasonable inferences in Plaintiffs' favor.  *Davis v. Wash. Univ. in St. Louis*, 960 F.3d 478, 483 (8th Cir. 2020).

### 1. Individual Defendants

The Court begins with the arguments raised by Defendants Burkett and Gaston in their Motions to Dismiss.  Docs. [45] and [68].  Against both, Plaintiffs assert claims under 42 U.S.C. § 1983, which provides a federal cause of action against officials acting under color of state law for damages caused by violations of federal constitutional or statutory rights.  In response, an individual officer can assert the defense of qualified immunity, which provides immunity from suit, *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), "insofar as [an official's] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "To prevail at this stage of the proceedings, defendants must show that they are entitled to qualified immunity on the face of the complaint." *Kiesling v. Holladay*, 859 F.3d 529, 533 (8th Cir. 2017).  Accordingly, the Court asks "(1) whether the facts, viewed in the light most favorable to the plaintiff, demonstrate the deprivation of a constitutional or statutory right; and (2) whether the right was clearly established at the time of the deprivation." *Barton v. Taber*, 820 F.3d 958, 963 (8th Cir. 2016).

### a. Defendant Burkett

Defendant Burkett argues that the unlawful search and seizure claims against him (Counts I and II) should be dismissed "because they fail to state specific facts which allege Defendant Burkett was personally involved in an unlawful search or seizure."  Doc. [69] at 3.  Defendant Burkett also asserts that he is entitled to qualified immunity and argues that Plaintiffs' Conspiracy

claim (Count III) should be dismissed because "Plaintiffs have failed to plead an unlawful search or seizure." *Id.* at 3–5.

The Court does not agree that Plaintiffs' allegations are deficient. It is axiomatic that an official's liability in a § 1983 case "requires a causal link to, and direct responsibility for, the deprivation of rights," *Clemmons v. Armontrout*, 477 F.3d 962, 967 (8th Cir. 2007), because "an official is only liable for his own misconduct," *Z.J. ex rel. Jones v. Kan. City Bd. of Police Comm'rs*, 931 F.3d 672, 688 (8th Cir. 2019). But the Court of Appeals for the Eighth Circuit has explained that liability under § 1983 is available where an individual sets "in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict constitutional injuries on third parties." *Darnell v. Ford*, 903 F.2d 556, 562 (8th Cir. 1990) (citation omitted). After all, § 1983 provides a cause of action against an officer who either "subjects" an individual to a constitutional violation or "*causes* [him or her] to be subjected" to one. 42 U.S.C. § 1983 (emphasis added). In other words, "[s]ection 1983 liability . . . is not limited to the officer who [unlawfully] puts on the handcuffs. It extends to all defendants who 'personally participated' in the [deprivation of rights]." *Dunn v. Does 1-22*, 116 F.4th 737, 749 (8th Cir. 2024) (quoting *White v. Jackson*, 865 F.3d 1064, 1081 (8th Cir. 2017)).

Here, the factual allegations in Plaintiffs' Complaint support a reasonable inference that Defendant Burkett personally participated in the unlawful search[5] of Plaintiff Henry when he either

---

[5] The parties do not brief the issue, but several courts have held that a Fourth Amendment violation occurs when officers track an individual's real-time location via their cell phone without a warrant and without an applicable exception to the warrant requirement, especially when the individual is tracked inside a private space. *See United States v. Baker*, 563 F. Supp. 3d 361, 381 (M.D. Pa. 2021); *Commonwealth v. Reed*, 647 S.W.3d 237, 247 (Ky. 2022) (en banc) (equating officer's collection of a cell phone's real-time cell-site location information to a "technological trespass" in violation of the Fourth Amendment). *But see United States v. Riley*, 858 F.3d 1012, 1018 (6th Cir. 2017) (per curiam) (distinguishing the Fourth Amendment implications of GPS tracking an individual on public thoroughfares *to* a private location versus unconstitutionally tracking them *within* a private location). On balance, and at this early stage, the Court finds that Plaintiffs have alleged a plausible unlawful search. *See Cooper v. Hutcheson*, 472 F. Supp. 3d 509, 514 (E.D. Mo. 2020) (finding, at the pleading stage, that the sporadic use of technology "to

(1) sought and acquired her real-time location based on exigent circumstances that he knew were false, *see* Doc. [1] ¶¶ 28–30, or (2) ordered his deputies to do so, *id.* ¶¶ 41–43, given his level of personal involvement in Defendant Gaston's alleged effort to find Plaintiff Henry and regain custody of J.G. under false pretenses, *id.* ¶¶ 29, 31–33.  Similarly, Plaintiffs' factual allegations allow the Court to reasonably infer that Defendant Burkett "caused [Plaintiff R.H.] to be subjected" to an unlawful seizure, 42 U.S.C. § 1983, when a group of Iron County Sheriff's Deputies, "by means of physical force or show of authority, . . . restrained [her] liberty" and led her to the police station under police escort, *United States v. Mabery*, 686 F.3d 591, 595–96 (8th Cir. 2012) (noting that "[c]ircumstances indicative of a seizure would include the threatening presence of several officers . . . indicating that compliance with the officer's request might be compelled"); Doc. [1] ¶¶ 39–40.  Because Defendant Burkett allegedly took or instigated these actions without any arguable, legal justification, *id.* ¶ 29 (alleging false claims of child endangerment), his alleged actions violated clearly established law.  *See Johnson v. Phillips*, 664 F.3d 232, 238 (8th Cir. 2011) (denying qualified immunity to an officer with "no arguable authority" to conduct a search); *see also Stanley v. Finnegan*, 899 F.3d 623, 627 (8th Cir. 2018) (acknowledging that removing a child "without reasonable suspicion of child abuse" violates clearly established law); *Fields v. City of Omaha*, 810 F.2d 830, 835 (8th Cir. 1987) (withholding qualified immunity from an officer who "briefly detain[ed] an individual" without "reasonable suspicion" of criminal activity).  Therefore, the Court will not dismiss Counts I, II, and III with respect to Defendant Burkett.

One loose end remains regarding Defendant Burkett's Motion, his argument regarding Count V.  He contends that Plaintiffs have failed to state a claim because they do not "plead anything beyond mere legal conclusions that there were unconstitutional policies, practices,

---

locate and track, on demand, any individual carrying a cell phone . . . could amount to a Fourth Amendment violation" (citation modified)).

- 7 -

customs, trainings, and supervision." Doc. [69] at 5. The Court does not agree. At this early stage, the question before the Court is whether Plaintiffs have alleged facts that (1) "support the existence of an unconstitutional policy or custom," *Watkins v. City of St. Louis*, 102 F.4th 947, 954 (8th Cir. 2024), or (2) indicate Defendant Burkett's "deliberate indifference to or tacit authorization of [a pattern of unconstitutional] acts" after notice of those acts. *Otey v. Marshall*, 121 F.3d 1150, 1155 (8th Cir. 1997). A plaintiff plausibly alleges an unconstitutional policy where his or her factual allegations "support the existence" of "a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Watkins*, 102 F.4th at 954. "Dismissal is proper when a complaint does not contain any 'allegations, reference, or language by which one could begin to draw an inference that the conduct complained of resulted from an unconstitutional policy or custom.'" *Id.* (quoting *Doe ex rel. Doe v. Sch. Dist. of City of Norfolk*, 340 F.3d 605, 614 (8th Cir. 2003) (citation modified)).

While these pleading requirements often prove insurmountable for many plaintiffs, the Court finds that Plaintiffs' allegations are sufficient to allow their claims to proceed to discovery. *See* Joanna C. Schwartz, *Municipal Immunity*, 109 Va. L. Rev. 1181, 1207 (2023) (finding *Monell* claims infrequently survived motions to dismiss); Nancy Leong *et al.*, *Pleading Failures in* Monell *Litigation*, 73 Emory L.J. 801, 828 (2024) (finding that it was "the exception" for sample complaints reviewed for the complaint "to clearly identify one or more theories of municipal liability and then satisfy all the elements of that theory"). Given the similarities between Defendant Burkett's alleged conduct and that of his deputies, *see id.* ¶¶ 28, 35, 41, Plaintiffs' allegations support a reasonable inference that Defendant Burkett ordered his deputies to undertake their alleged unlawful conduct. *Id.* ¶¶ 25–27, 41–43. By virtue of Defendant Burkett's position, then, "one could begin to draw an inference that the conduct complained of" in Plaintiffs' Complaint

resulted from "a deliberate choice of a guiding principle or procedure" that then-Sheriff Burkett instituted within his Department, especially because Defendant Burkett plausibly "ha[d] final authority regarding such matters." *Watkins*, 102 F.4th at 954; *see Angarita v. St. Louis County*, 981 F.2d 1537, 1547 (8th Cir. 1992) (finding sufficient evidence at trial that "the highest ranking police official in St. Louis County" was a county policymaker).

Additionally, Plaintiffs' allegations support a reasonable inference that Defendant Burkett—at the very least—had notice of and tacitly authorized his deputies' alleged unconstitutional conduct. *See Null v. Garcia*, 709 F. Supp. 3d 745, 767 (W.D. Mo. 2023) (noting that "an individual-capacity failure to train/supervise claim under § 1983 exists where the supervisor was deliberately indifferent to or tacitly authorized the unconstitutional acts"); *cf.* Fed. R. Civ. P. 8(d) (allowing plaintiff to state alternative and inconsistent claims for relief on the same facts). Discovery may uncover different information and demand a different result, but at this stage, all Plaintiffs must do is plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Because Plaintiffs have done so, the Court will not dismiss Counts I, II, III, or V as to Defendant Burkett.

### b. Defendant Gaston

Turning next to Defendant Gaston's arguments, he asserts that Plaintiffs' Complaint must be dismissed because he is a private actor, and none of the allegations set forth in Plaintiffs' complaint establish that he was "acting under color of law," as § 1983 requires. Doc. [46] at 7. Defendant Gaston is of course correct that § 1983 "provides a federal cause of action against any person who, acting under color of state law, deprives another of his federal rights." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999). Thus, in the vast majority of cases, § 1983 actions are brought

against state officials or officers.  But "[t]he United States Supreme Court has recognized several circumstances in which a private party may also be characterized as a state actor," thereby making the private party subject to § 1983 liability.  *Cooper*, 472 F. Supp. 3d at 513.

Those circumstances include, as relevant here, when a private actor is a "willful participant in joint activity with the State or its agents." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 151 (1970).  In addition, "an otherwise private person acts under color of state law when engaged in a conspiracy with state officials to deprive another of federal rights." *Tower v. Glover*, 467 U.S. 914, 920 (1984).  To prove a claim of conspiracy under § 1983, a plaintiff must show "(1) that the defendant conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators was engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured the plaintiff." *White v. McKinley*, 519 F.3d 806, 814 (8th Cir. 2008).  At the pleading stage, a plaintiff must put forth factual allegations indicating that there was "a mutual understanding, or a meeting of the minds, between the private party and the state actor." *Magee v. Trs. of Hamline Univ., Minn.*, 747 F.3d 532, 536 (8th Cir. 2014).

Defendant Gaston contends that his alleged conduct "is more akin to the cases . . . wherein private parties made reports to law enforcement, provided information to law enforcement, and worked with law enforcement" and were found not to have acted under color of law.  Doc. [46] at 7.  True, "[t]he mere invocation of state legal procedures, including police assistance, does not convert a party into a state actor." *Youngblood v. Hy-Vee Food Stores, Inc.*, 266 F.3d 851, 855 (8th Cir. 2001).  Similarly, "the mere furnishing of information to a law enforcement officer, even if the information is false, does not constitute joint activity with state officials." *Gibson v. Regions Fin. Corp.*, 557 F.3d 842, 846 (8th Cir. 2009) (agreeing with the district court and so holding).  But Plaintiffs' allegations go beyond the mere furnishing of information or invoking the help of

- 10 -

state police. Rather, Plaintiffs' factual allegations permit a plausible inference that Defendant Gaston worked closely with the other individual Defendants to unlawfully track the location of Plaintiff Henry and unlawfully seize J.G. under false pretenses. *See* Doc. [1] ¶¶ 33, 35–36. Accordingly, the Court will not dismiss Count III as to Defendant Gaston.

### 2. Iron County

For its part, Defendant Iron County argues that it should not be named in Count I ("Unreasonable Search") or Count II ("Unreasonable Seizure") because, by doing so, Plaintiffs seek to hold the County liable solely "under the theory of respondeat superior." Doc. [37] at 2. Iron County is correct that, under § 1983, a municipality cannot be held liable on a theory of respondeat superior liability. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *cf. Wilson v. United States*, 989 F.2d 953, 958 (8th Cir. 1993) ("Under the doctrine of respondeat superior an employer is liable for the negligent acts or omissions of his employee which are committed within the scope of his employment."). But in response to Iron County's Motion, Plaintiffs clarify that they are not alleging "that Iron County should be held liable solely because it employs [the individual Defendants]"; rather, by naming Iron County in Counts I and II, Plaintiffs allege "that through the execution of Iron County's policy or custom, Plaintiffs were injured when their Fourth Amendment rights were violated during improper searches and seizure." Doc. [48] at 8.

Plaintiffs' position is perplexing because the Court understands Count IV to encompass these theories of liability. Doc. [1] ¶ 87, 89 (alleging that Iron County's policies, customs, and deliberately indifferent supervision and training practices "were moving forces" behind Plaintiffs' injuries). Indeed, in its present Motion, Iron County makes no argument regarding Plaintiffs' Count IV ("Deliberately Indifferent Policies, Practices, Customs, Training, and Supervision in violation of the Fourth Amendment"), and therefore, Iron County does not seem to dispute that

- 11 -

Plaintiffs' Complaint states at least a plausible claim against it for municipal liability as set forth in *Monell v. Department of Social Services* and similar cases. 436 U.S. 658 (1978). In short, the Court finds Iron County's position well taken, especially because it does not seek dismissal of Count IV at this time. Accordingly, the Court will grant Defendant Iron County's Motion and dismiss Count I and Count II solely as to Iron County. Iron County remains a Defendant in this action as to Count IV.

### B. Verizon's Motion to Compel Arbitration

Verizon moves to dismiss each Count asserted against it "for failure to state a claim upon which relief can be granted." Doc. [44]. Alternatively, Verizon asks the Court to compel arbitration given the broad scope of the arbitration agreements applicable here. Because "a court is not to rule on the potential merits of the underlying claims," when evaluating a motion to compel arbitration, the Court begins its analysis with Verizon's arbitration-related arguments. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986).

Arbitration agreements are subject to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.*, which "reflects a liberal federal policy favoring arbitration," *Torres v. Simpatico, Inc.*, 781 F.3d 963, 968 (8th Cir. 2015) (quoting *AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333, 339 (2011)). The statute "places arbitration agreements on an equal footing with other contracts and requires courts to enforce them according to their terms." *Rent-A-Center, W., Inc. v. Jackson*, 561 U.S. 63, 67 (2010) (internal citations omitted). As such, arbitration agreements may be "invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability." *Concepcion*, 563 U.S. at 339. When considering a motion to compel arbitration, the Court asks "(1) whether there is a valid arbitration agreement and (2) whether the particular dispute falls within the terms of that agreement." *Robinson v. EOR-ARK, LLC*, 841 F.3d

- 12 -

781, 783–84 (8th Cir. 2016).  State law governs the former question,[6] *see Bank of Am., N.A. v. UMB Fin. Servs., Inc.*, 618 F.3d 906, 912 (8th Cir. 2010), but federal law governs the latter, *see Donaldson Co. v. Burroughs Diesel, Inc.*, 581 F.3d 726, 731 (8th Cir. 2009).  "[A]s a matter of federal law, any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration."  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983).

The party seeking to compel arbitration "carries the burden to prove a valid and enforceable agreement."  *Shockley v. PrimeLending*, 929 F.3d 1012, 1017 (8th Cir. 2019) (citing *Jackson v. Higher Educ. Loan Auth. of Mo.*, 497 S.W.3d 283, 287 (Mo. Ct. App. 2016)).  As part of their agreement, the parties "can agree to arbitrate gateway questions of arbitrability, such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy."  *Rent-A-Center*, 561 U.S. at 68–69.  "An agreement to arbitrate a gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other."  *Id.* at 70.  To that end, unless the party opposing arbitration specifically challenges the delegation provision, courts "must treat it as valid" under the FAA, "leaving any challenge to the validity of the Agreement as a whole for the arbitrator."  *Id.* at 72.

Here, it is undisputed that Plaintiff Henry signed two Device Payment Agreements when she activated two cell-phone lines on her Verizon account.  *See, e.g.*, Doc. [44-2].[7]  Those

---

[6] Unless the parties dispute the matter, the Court applies the substantive law of Missouri by default.  *See BBSerCo, Inc. v. Metrix Co.*, 324 F.3d 955, 960 n.3 (8th Cir. 2003) (citing *R.E. Wood v. Mid-Valley, Inc.*, 942 F.2d 425, 426 (7th Cir. 1991) ("[W]hen neither party raises a conflict of law issue in a diversity case, the federal court simply applies the law of the state in which the federal court sits.")).

[7] When a motion to compel arbitration relies on matters outside of the pleadings, a district court must treat the motion as one of summary judgment.  *City of Benkelman v. Baseline Eng'g Corp.*, 867 F.3d 875, 882 (8th Cir. 2017); *Neb. Mach. Co. v. Cargotec Sols., LLC*, 762 F.3d 737, 741–42 (8th Cir. 2014).  Accordingly, granting a motion to compel arbitration is proper if, like summary judgment, "there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law."  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (citing Fed. R. Civ. P. 56(c)(2)).

Agreements state that Plaintiff Henry "agree[s] to the Verizon Customer Agreement," "including the Verizon Privacy Policy, and settlement of disputes by arbitration instead of jury trial," Doc. [44-2] at 5.  They also clearly state that "[t]he . . . provisions of your Customer Agreement are incorporated by reference in this Device Payment Agreement."  *Id.* at 2.[8]  The Customer Agreement states, in part:

> Except for small claims court cases, any dispute that in any way relates to or arises out of this agreement, or from any equipment, products and services you receive from us . . . will be resolved by one or more neutral arbitrators before the American Arbitration Association ("AAA") or Better Business Bureau ("BBB"). . . . For claims of over $10,000 the AAA's consumer arbitration rules will apply.

Doc. [44-4] at 7.  The AAA consumer arbitration rules provide that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim."[9]

The Court agrees with Verizon that Plaintiff Henry's acceptance of the above terms establishes the existence contract between the parties that arguably covers the dispute between them.[10]  Moreover, the Court agrees that the incorporated AAA jurisdiction rule constitutes a

---

[8] This language is sufficient to incorporate the terms of the Customer Agreement into the Device Payment Agreement under Missouri law.  *See Dunn Indus. Grp, Inc. v. City of Sugar Creek*, 112 S.W.3d 421, 435 n.5 (Mo. banc 2003) ("[M]atters incorporated into a contract by reference are as much a part of the contract as if they had been set out in the contract in haec verba."); *see also State ex rel. Hewitt v. Kerr*, 461 S.W.3d 798, 810–11 (Mo. banc 2015) (per curiam) (internal citations omitted) ("The intent to incorporate must be clear, . . . [and] the contract must make clear reference to the document and describe it in such terms that its identity may be ascertained beyond a doubt.").

[9] *See* American Arbitration Association, Consumer Arbitration Rules: R-14 Jurisdiction (effective Sep. 1, 2014), https://www.adr.org/media/tiifv2ft/consumer_rules_web.pdf.  The Court properly takes judicial notice of this document because "it is publicly available and its accuracy cannot reasonably be questioned."  *Fisher v. Aetna Life Ins. Co.*, 32 F.4th 124, 139 n.5 (2d Cir. 2022).

[10] Plaintiffs do not dispute that the doctrine of estoppel allows Verizon to compel Plaintiff R.H. to arbitration, even though she is not a signatory to the agreements at issue.  Doc. [47] at 19 n.9 ("R.H. may not be permitted to use Verizon services pursuant to the Customer Agreement . . . yet now attempt to avoid the Customer Agreement's arbitration clause.").  Under direct-benefits estoppel, a non-signatory "can become bound to an agreement . . . by knowingly seeking and obtaining direct benefits from that [agreement]."  *Reid v. Doe Run Res. Corp.*, 701 F.3d 840, 846 (8th Cir. 2012) (applying Missouri law).  "By accepting benefits, a party may be estopped from questioning the existence, validity, and effect of a contract."  *Dunn Indus.*, 112 S.W.3d at 437.  Here, Plaintiff R.H. accepted direct benefits from the contracts at issue by using the cell-phone service that those contracts guaranteed.  Doc. [1] ¶ 39; *see Hillow v. E*Trade Securities, LLC*, 4:22-cv-145-JAR, 2022 WL 1165791, *7–8 (E.D. Mo. Apr. 20, 2022) (applying

delegation clause requiring the Court to refer any threshold questions about the validity or scope of the arbitration agreement to an arbitrator. *See Fallo v. High-Tech Inst.*, 559 F.3d 874, 880 (8th Cir. 2009) ("[I]ncorporation of the AAA rules is clear and unmistakable evidence that [the parties] intended to allow an arbitrator to answer [the question of arbitrability]."); *State ex rel. Pinkerton v. Fahnestock*, 531 S.W.3d 36, 48 (Mo. banc 2017) ("By clearly referencing the AAA . . . rules, the parties expressed their intent to arbitrate any dispute under these rules, including the AAA's 'jurisdiction' rule."), *abrogated on other grounds by*, *Theroff v. Dollar Tree Stores*, 591 S.W.3d 432 (Mo. banc 2020).

To be sure, Plaintiffs oppose Verizon's Motion, arguing that the arbitration agreement is invalid because it is a contract of adhesion that is unenforceable on unconscionability grounds. Doc. [62] at 12–14; *see, e.g.*, *Brewer v. Mo. Title Loans*, 364 S.W.3d 486, 493–94 (Mo. banc 2012) (declining to enforce "extremely one-sided" arbitration provisions that, in part, allowed the drafting party "to obtain its primary remedies through the court system" but forced plaintiff to arbitrate); *Rose v. Sabala*, 632 S.W.3d 428, 433 (Mo. Ct. App. 2021) (declining to enforce an arbitration agreement obliquely referenced on a signed customer receipt). But notably, Plaintiffs do not dispute that Plaintiff Henry signed the relevant agreements, *see Theroff*, 591 S.W.3d at 439–40 (declining to enforce a delegation provision in light of a genuine dispute as to the "factual existence" of the agreements at issue (citing *New Pime Inc. v. Oliveira*, 586 U.S. 105, 110–11 (2019))), or that Plaintiff R.H. directly benefited from the relevant agreements, Doc. [1] ¶ 39. Nor do Plaintiffs specifically challenge the delegation clause incorporated into the Customer Agreement—and, likewise, the Device Payment Agreement—by reference to the AAA consumer

---

estoppel and enforcing arbitration where non-signatory plaintiff received benefits of a contract).  The Customer Agreement's express terms contemplate this result, stating that "[t]his agreement also applies to all lines on your account and anyone who uses your Service." Doc. [44-4] at 1.

arbitration rules. *See Karlin v. UATP Springfield, LLC*, 706 S.W.3d 810, 816 (Mo. banc 2025) (enforcing arbitration as to "legal challenges to the validity and scope" of an arbitration agreement because plaintiff "raise[d] no challenge specific to the delegation clause"). "Absent such a challenge, . . . courts must respect the parties' decision to delegate [threshold questions] to an arbitrator." *Lackie Drug Store, Inc. v. OptumRx, Inc.*, 143 F.4th 985, 998 (8th Cir. 2025) (citation omitted) (citation modified). Accordingly, the Court will grant Verizon's Motion to Compel Arbitration, and the Court and will stay this matter as to the claims that Plaintiffs assert against it.

### C. Motions for Stay Pending Criminal Proceedings

Defendant Cozad and Defendant Gaston seek a stay of these proceedings to protect their Fifth Amendment privilege against self-incrimination with respect to their underlying criminal charges. Doc. [66]; Doc. [79]. Under these circumstances, "to warrant a stay, [a] defendant must make a strong showing either that the two proceedings are so interrelated that he cannot protect himself at the civil trial by selectively invoking his Fifth Amendment privilege or that the two trials will so overlap that effective defense of both is impossible." *Koester v. Am. Republic Invs.*, 11 F.3d 818, 823 (8th Cir. 1993) (citation omitted). "[T]he strongest case for deferring civil proceedings . . . is where a party under indictment for a serious offense is required to defend a civil or administrative action involving the same matter." *SEC v. Dresser Indus., Inc.*, 628 F.2d 1368, 1375–76 (D.C. Cir. 1980). Other relevant factors include:

> (1) the interest of the plaintiffs in proceeding expeditiously with this litigation or any particular aspect of it, and the potential prejudice to plaintiffs of a delay; (2) the burden which any particular aspect of the proceedings may impose on defendants; (3) the convenience of the court in the management of its cases, and the efficient use of judicial resources; (4) the interests of persons not parties to the civil litigation; and (5) the interest of the public in the pending civil and criminal litigation.

*Keating v. Off. of Thrift Supervision*, 45 F.3d 322, 325 (9th Cir. 1995).

Upon review of the relevant briefing, the Court finds that it cannot accurately weigh the relevant factors because it does not know the present status of the Defendants' respective criminal proceedings, especially considering Defendant Gaston's representation that the relevant "Missouri state criminal matters appear as if they will be resolved by May 2025." Doc. [79] at 2. Accordingly, the Court will deny Defendant Cozad and Defendant Gaston's respective Motions for Stay without prejudice. Any renewed Motion for Stay should include a status report on the current progress of the relevant criminal proceedings.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Iron County's Motion to Dismiss Counts I and II of Plaintiff's Complaint, Doc. [36], is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant Verizon Wireless Communication Inc.'s Motion to Dismiss or Compel Arbitration, Doc. [44], is **GRANTED** in part.

**IT IS FURTHER ORDERED** that this proceeding is **STAYED** pending arbitration <u>as to Plaintiffs' claims against Defendant Verizon Wireless Communications Inc. only.</u> Plaintiffs and Defendant Verizon Wireless Communications Inc. shall provide a status report regarding the arbitration process within 90 days of the date of this order and every 90 days thereafter.

**IT IS FURTHER ORDERED** that Defendant Donald Rickie Gaston's Motion to Dismiss, Doc. [45], is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Jeffrey Burkett's Motion to Dismiss, Doc. [68], is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Matthew Cozad's Motion for Stay, Doc. [66], is **DENIED** without prejudice.

**IT IS FINALLY ORDERED** that Defendant Donald Rickie Gaston's Motion for Stay, Doc. [79], is **DENIED** without prejudice.

Dated this 30th day of September 2025.

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE